UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MMMG, Inc.,<br><br>*Plaintiff*,<br><br>v.<br><br>Cordae Dunston p/k/a Cordae, EMPIRE Distribution, Inc., Apeshit, Inc., and Mass Appeal Records, LLC,<br><br>*Defendants*. | Case No. 1:26-cv-9079<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff MMMG, Inc. ("Plaintiff," "Company," or "MMMG"), by and through its undersigned attorneys, for its Complaint against Cordae Dunston p/k/a Cordae ("Cordae" or "Artist"), EMPIRE Distribution, Inc. ("EMPIRE"), Apeshit, Inc. ("AI"), and Mass Appeal Records, LLC ("Mass Appeal") (collectively, "Defendants"), alleges as follows.

## PRELIMINARY STATEMENT

### A. Introduction

1. MMMG is a record label. Cordae is a recording artist, songwriter, and performer. MMMG and Cordae are parties to a recording agreement (the "Recording Agreement" or the "Agreement") dated April 2018. Each side was represented by its own sophisticated lawyer in negotiating the Agreement. Under the Agreement, Cordae has been paid millions of dollars and achieved wide acclaim and popularity.

2. Since the parties signed the Agreement, MMMG has held up its end of the bargain, including by investing enormous amounts of time, money, and other resources in Cordae's career. In contrast, while Cordae gladly accepted the benefits of the Recording

Agreement, he has flouted his own obligations under it. Rather than live up to his commitments, Cordae prefers to put his head in the sand and pretend that the Agreement does not even exist. This lawsuit is the direct result of Cordae's mistreatment of MMMG.

**B. The Provisions of the Recording Agreement**

3. During the Term of the Recording Agreement, which is ongoing, MMMG is entitled to Cordae's exclusive services as a recording artist. The Agreement makes clear that MMMG is the sole copyright owner of the recordings that Cordae makes during the Term.

4. The Recording Agreement also specifies that MMMG will have the sole right to Cordae's merchandising, touring, endorsement, and other ancillary services during the Term, and that Cordae and MMMG will split the revenues from those services in specified percentages.

**C. Cordae's Breaches of the Recording Agreement**

5. For years, Cordae has refused to fulfill his duties under the Recording Agreement. He will not abide by his contractual promises to provide MMMG with his exclusive merchandising, touring, endorsement, and other ancillary services, and he refuses to pay MMMG its contractual share of the revenues earned by these activities.

6. As bad as Cordae's earlier contractual breaches were, he has now made matters far worse. In violation of MMMG's copyright rights and its exclusive rights to his recording services, Cordae entered into an agreement with the other Defendants to this action (who are record labels) to release an album of his recorded music without MMMG's permission.

**D. Defendants' Copyright Infringement**

7. After this album was announced, MMMG made crystal-clear to Cordae and other Defendants that its release would infringe MMMG's copyrights and breach Cordae's contractual

obligation to furnish his recording services exclusively to MMMG. However, Defendants did not heed this warning, and they continue to act in disregard for MMMG's rights.

8. Although Defendants announced a release date for this album of October 23, 2026, they have already released an advance single (and accompanying music video) called "A Good Day"—in willful disregard for MMMG's rights. Defendants have made clear that they intend to release the entire infringing album as scheduled. In light of these actions, MMMG has no choice other than to file this lawsuit.

**E. Summary of MMMG's Claims**

9. In this lawsuit, MMMG asserts three types of claims. First, MMMG asserts claims against all Defendants for willful copyright infringement in connection with the single "A Good Day." Second, MMMG asserts claims against Cordae for breach of the Recording Agreement, based upon his: (a) refusal to comply with his contractual obligations as to his merchandise, endorsement, touring, and other ancillary services; and (b) breach of his obligation to provide his recording services exclusively to MMMG. Third, MMMG has asserted a claim against the other Defendants for tortiously interfering with the Recording Agreement, by wrongfully inducing Cordae to provide his recording services to them.

10. Before filing this lawsuit, MMMG gave Defendants ample time to correct their behavior and fully compensate MMMG for the harm that they caused. They failed to do so. MMMG will now vindicate its rights, and recover its damages, in Court.

**THE PARTIES**

11. MMMG is a Delaware corporation that maintains its principal place of business in Florida. It is a record label.

12. Cordae is an individual and a citizen of the State of California.

13. EMPIRE is a Delaware corporation that maintains its principal place of business in Florida. It is a record label and distributor.

14. AI is a Delaware corporation that maintains its principal place of business in California. It is a record label.

15. Mass Appeal is a New York limited liability company that maintains its principal place of business in New York. It is a record label.

**JURISDICTION AND VENUE**

16. This is a civil action in which Plaintiff seeks damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. § 101, *et seq*.

17. This Court has original subject matter jurisdiction over Plaintiff's copyright infringement claims pursuant to 28 U.S.C. § 1331 and 1338(a).

18. This Court has supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367, because they are so related to Plaintiff's copyright infringement claims that they form part of the same case or controversy under Article III of the United States Constitution.

19. This Court has personal jurisdiction over all Defendants because they committed a substantial part of the wrongful acts which form the basis for the Complaint within the State of New York.

20. This Court also has personal jurisdiction over Cordae because in Section 15(c) of the Recording Agreement, he agreed that "ALL CLAIMS, DISPUTES OR DISAGREEMENTS WHICH MAY ARISE OUT OF THE INTERPRETATION, PERFORMANCE OR BREACH OF THIS AGREEMENT SHALL BE SUBMITTED EXCLUSIVELY TO THE JURISDICTION OF

THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK, NEW YORK." (capitalization in original).

21. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events and omissions complained of herein occur, or have occurred, in this district. Venue is also proper as to MMMG's claims against Cordae because in Section 15(c) of the Recording Agreement, Cordae consented to this venue.

## FACTS APPLICABLE TO ALL COUNTS

### A. Background

22. MMMG is an established record label that has released many successful recordings in the rap/hip-hop genre. MMMG invests substantial money, time, effort, and talent to develop, produce, publish, acquire, license, and otherwise exploit the copyrights in sound recordings.

23. Cordae and MMMG entered into an exclusive recording agreement (the "Recording Agreement") with an effective date of April 2018. The Recording Agreement was negotiated on behalf of Cordae by a sophisticated and experienced lawyer.

24. Section 15(c) of the Agreement contains a mandatory New York choice of law provision. It states: "THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS AND JUDICIAL DECISIONS OF THE STATE OF NEW YORK." (capitalization in original).

### B. The Relevant Provisions of the Recording Agreement

25. Pursuant to the Recording Agreement, Company is entitled to, among other things, the exclusive services of Artist as a musical recording artist during the Term, in exchange

for the payment to Artist of specified royalties.[1] *See* Recording Agreement Section 2 (stating that during the Term, Artist will "render exclusively to Company, Artist's services as a musical recording artist for the purpose of making master recordings ('Masters') for Company, (ii) cause the Masters to be produced and (ii[i]) Deliver the Masters to Company.").

26. Under the Recording Agreement, the Masters embodying Artist's musical performances during the Term constitute works made for hire in which Company is the exclusive copyright owner. *See* Recording Agreement Section 11(a). The Recording Agreement further states that, in the event that the Masters are found not to be works made for hire, then the copyrights in those Masters are deemed to be irrevocably assigned by Artist to MMMG.

27. Section 7 of the Agreement provides MMMG with exclusive merchandise rights pertaining to Cordae; it also provides that net income from MMMG's exercise of these merchandise rights would be split 50-50 between MMMG and Cordae. It states in relevant part:

> You hereby grant to Company and Company's licensees the exclusive right, throughout the world, to use and authorize the use of your name, approved portraits, pictures, likenesses and biographical material (collectively "Name and Likeness"), either alone or in conjunction with other elements, in connection with the sale, lease, licensing, or other disposition of any merchandising ("Merchandise Uses") (including without limitation any and all uses of Artist's Name and Likeness in connection with sponsorships, endorsements, [including your personal services in connection with any endorsements], tie-ins, retail and connect tour merchandising, "bounceback", merchandising, fan clubs, etc.), whether or not in connection with Master Recordings hereunder. For the rights granted by you to Company in this paragraph, Company shall pay you a royalty of fifty percent (50%) of Company's net royalty receipts derived from Merchandising Uses, after deducting all costs and third party payments relating thereto including, without limitation, all costs incurred by Company which are attributable, in whole or in part, to the negotiation of licenses and other agreements for the uses of Artist's Name and Likeness subject to this paragraph ("Net Merchandising Monies").

---

[1] The definition of "Term" under the Recording Agreement is explained *infra*.

28. Section 11(g) of the Agreement provides Company with additional, and extensive, exclusive rights in Cordae's other entertainment services, which it refers to as "Ancillary Endeavors." It states:

> Artist hereby grants to Company and its licensees the exclusive right, throughout the Territory to furnish Artist's services (or to grant to third parties the rights, as applicable) during the Term and for three (3) months thereafter in connection with: (i) personal appearances whether or not before an audience and whether or not live and/or recorded for exhibition or broadcast, including without limitation tours; (ii) appearing, acting or performing in television programs, video, films (whether musical or non-musical) or in live theatre productions as an artist or as an actor; (iii) the exploitation, transmission or distribution of recordings of performances by Artist via wired or wireless systems, broadband, narrowband or other internet, satellite, optical fiber, wire cable or telephone; (iv) the writing of literary or dramatic works, including without limitation, fictional and non-fictional works, poems, newspaper, magazine and other press articles and manuscripts (including without limitation, television and film scripts and screenplays; (v) exploiting Artist's name(s), reputation, image and other likenesses for any sponsorship, endorsement, or for any other advertising, commercial or promotional purposes; and (vi) entertainment-related activities and services related to Artist (other than Merchandising as described above) including, without limitation, touring activities, touring merchandising income, special marketing arrangements, and strategic partnerships, etc. ("Ancillary Endeavors").

29. Section 11(h) provides Company with the right to thirty percent (30%) of Cordae's net income from Ancillary Endeavors. It states in relevant part:

> Company shall pay to Artist seventy percent (70%) of all net receipts ("Ancillary Net Receipts") in connection with any Ancillary Endeavors and all rights provided in paragraph 10(g) . . . .

**C. The Ongoing Term of the Recording Agreement**

30. The "Term" (*i.e.*, the duration) of the Recording Agreement is ongoing. Pursuant to Sections 3(a) through 3(c) of the Recording Agreement, the Term of the Recording Agreement lasts for one Initial Contract Period, plus four additional, optional Contract Periods which Company has the right to exercise. Company has exercised the right to these optional Contract

Periods. The Recording Agreement anticipates that, during each of these Contract Periods, Artist will, among other things, make "complete Delivery to Company of the Masters sufficient to constitute an Album embodying Artist's performance," and that such Album will be released.[2] To date, Cordae has Delivered two Albums to Company, each of which have been released; thus, the parties presently are in the second optional Contract Period.

31. The Recording Agreement further anticipates that Company would enter into an agreement with a "Qualified Distributor" to distribute Artist's Masters in the marketplace (a "Distribution Agreement"). A "Qualified Distributor" is defined in Section 3(d)(i) as "a record company or distribution company: (A) which is a parent or subsidiary of, or is affiliated with (i.e., shares common ownership with), one of the major record label groups in the United States (which distributors are presently Sony Music Entertainment, Universal Music Group and Warner Music Group), or which is a parent or subsidiary of, or affiliated with, one of the so-called 'indie' distributors which provide national distribution (which 'indie' distributors presently include, without limitation, Human Resources, RED, ADA, INgrooves and E1 Music'); (B) whose records are distributed in the United States by any such record company or distribution company; or (C) which is mutually approved by Company and [Artist]."

32. Under Section 3(d)(ii) of the Recording Agreement, if Company's Distribution Agreement ends before the conclusion of the Term, then Company has the right to release Artist's Masters under another Distribution Agreement with a Qualified Distributor. It states:

> Notwithstanding anything to the contrary herein, in the event that the term of any Distribution Agreement expires or is terminated

[2] The Recording Agreement defines "Deliver" and "Delivery" as "the actual receipt by Company and Distributor of fully mixed and edited Master Recordings commercially and technically satisfactory to Company and Distributor and ready for Company's and Distributor's manufacture of Records, and all necessary licenses, consents, and approvals, and other items required by Company and Distributor."

> prior to the expiration of the Term hereof, the then current Period hereof shall be extended, and the running of all time periods set forth in this Agreement shall be suspended for the duration of the time period (the "New Shopping Period") which begins as of the date of such expiration or termination of the term of such Distribution Agreement (the "Distribution Agreement End Date") and continues through and until the date that Company enters into a new Distribution Agreement. Notwithstanding the foregoing, in no event shall any New Shopping Period exceed six (6) months in duration, and if Company has not entered into a new Distribution Agreement as of the date which is six (6) months after the Distribution Agreement End Date, the Term hereof shall be deemed to automatically expire, and all parties hereto shall be deemed to have fulfilled all of their obligations hereunder.

### D. MMMG Obtains a Distribution Agreement with Atlantic

33. A few months after the entry of the Recording Agreement, Company and Atlantic Recording Corporation ("Atlantic") entered into a Distribution Agreement dated September 25, 2018 (the "Atlantic Agreement"). Atlantic unquestionably is a Qualified Distributor because it is part of Warner Music Group. Both of Artist's albums to date were released by Atlantic pursuant to the Atlantic Agreement. Under Section 5(a) of the Atlantic Agreement, Cordae received compensation including a $1 million advance upon signing, and another $1 million advance upon exercise of the first optional Contract Period, among other favorable terms.

### E. MMMG Obtains a Distribution Agreement with Stem; MMMG Then Relies upon Cordae's Silence in Concluding that Cordae Had No Objection to the Agreement with Stem

34. On September 2, 2025, Atlantic sent a letter to Company and Artist stating that the term of the Distribution Agreement ended on that same date. Accordingly, the New Shopping Period commenced on September 2, 2025.

35. Just two days later, on September 4, 2025, Company sent counsel for Artist a letter confirming that Company had already obtained a Distribution Agreement with a new Qualified Distributor, and thus the Term of the Recording Agreement would continue. The letter

stated in relevant part: "While the Shopping Period just commenced, Company has already obtained a Distribution Agreement with Stem Disintermedia Inc. ('Stem') that will encompass the release of Artist's new Records on a going-forward basis. Stem satisfies the requirements for a Distributor under the Section 14(c) of the Agreement, because Stem is 'one of the so-called 'indie' distributors which provide national distribution . . . .'"

36. Stem is an eminently reasonable choice to serve as the new Qualified Distributor. In 2018, MMMG released through Stem a track by Artist entitled "Kung Fu." "Kung Fu" was extraordinarily successful; it achieved platinum status via the RIAA, and it led to MMMG and Cordae signing the Atlantic Agreement.

37. When Cordae and his representatives received Company's letter dated September 4, 2025, they promptly devised a bad-faith plan to try to wriggle out of the Recording Agreement. Specifically, Cordae and his representatives concocted arguments regarding why MMMG's agreement with Stem (the "Stem Agreement") purportedly did not meet the requirements for a Distribution Agreement under Section 3(d)(ii) of the Recording Agreement.[3] However, Cordae and his representatives decided that they would wait to assert those arguments until long after the Shopping Period had expired. This way, when Cordae and his representatives eventually asserted to MMMG that the Stem Agreement was purportedly invalid, they could further argue that it was too late for MMMG to obtain a valid Distribution Agreement because the Shopping Period concluded a long time ago.

[3] As discussed below, the purported challenges to the validity of the Stem Agreement, which Cordae has belatedly asserted, are completely without merit.

38. If Cordae had asserted objections to the validity of the Stem Agreement during the Shopping Period, then MMMG would have addressed those objections and resolved them before the Shopping Period expired.

39. However, as the direct result of Cordae's conscious, strategic decision to defer challenging the validity of the Stem Agreement until after the Shopping Period, MMMG reasonably believed that Cordae did not have objections to the validity of the Stem Agreement under Section 3(d)(ii) or otherwise. Cordae and his representatives knew that MMMG had formed this belief because of their calculated silence.

40. As explained in more detail below, because of their bad-faith conduct in concealing their objections during the Shopping Period, Cordae and his representatives are barred by the fundamental legal principles of waiver and estoppel from now asserting those objections after the Shopping Period has concluded.

**F. Cordae Breaches the Recording Agreement by Refusing to Honor Company's Rights for Merchandising and Ancillary Endeavors**

41. For many years, both before and after the Shopping Period, Artist has refused, and continues to refuse, to honor Company's exclusive right to Merchandise Uses in breach of Section 7 of the Recording Agreement. Instead, Artist consistently has been engaging in unauthorized Merchandise Uses—including but not limited to selling unauthorized merchandise through a company called "Hi Level" and on various websites operated by Cordae, and purporting to license Merchandise Uses to third parties. Company repeatedly has placed Artist on notice that this conduct breaches the Recording Agreement. Company also has demanded on numerous occasions a full accounting of all Merchandise Uses by Artist and his purported licensees, as well as prompt and full payment by Artist to Company of its full contractual share of all merchandising revenues. Cordae refuses to comply with these demands.

42. Also, in violation of Section 11(g), Artist has failed to grant Company its right to furnish Artist's Ancillary Endeavors. Instead, for many years, both before and after the Shopping Period, Artist improperly has furnished his Ancillary Endeavors personally and/or through third parties. Moreover, over this same period, Artist has failed to account for—let alone pay—Company's contractual share of 30% of Ancillary Net Receipts from these Ancillary Endeavors as required by Section 11(h) of the Agreement. MMMG has repeatedly demanded that Cordae comply with Sections 11(g) and 11(h), but Cordae refuses to do so.

**G. Defendants Announce Their Intent to Release an Infringing Album**

43. On or about August 19, 2026, Defendants publicly announced that they would be releasing an album entitled *Heavy Is The Crown*, featuring the recorded performances of Cordae, on October 23, 2026. Defendants never requested nor received a license from MMMG to release this album or any of the tracks on it. Given that the Term of the Recording Agreement is ongoing, the release and/or other exploitation of Cordae's recordings (whether on the *Heavy Is The Crown* album or otherwise): (a) infringes MMMG's copyrights in those recordings; and (b) violates MMMG's contractual right to Cordae's exclusive recording services.

44. On August 20, 2026, MMMG sent a cease-and-desist letter to EMPIRE and Mass Appeal (the "Cease and Desist") informing them of the same. In relevant part, the Cease and Desist stated the following:

> Company is party to an exclusive recording agreement with Cordae Dunston p/k/a Cordae (the "Recording Agreement") dated as of April 2018. Pursuant to the Recording Agreement, Company is entitled to, among other things, the exclusive services of Mr. Dunston as a musical recording artist during the Term. As provided by the Agreement, the master recordings embodying Mr. Dunston's musical performances during the Term constitute works made for hire in which Company is the exclusive copyright owner.

> It has come to Company's attention that EMPIRE Distribution, Inc. ("EMPIRE") and Mass Appeal Records ("Mass Appeal") intend to release an album containing Mr. Dunston's recorded performances entitled *Heavy Is The Crown* (the "Album"). Please be advised that the release or other exploitation of the Album, or any other recorded performances by Mr. Dunston, will infringe Company's copyrights and violate Company's contractual right to Mr. Dunston's exclusive recording services. Company hereby demands that EMPIRE and Mass Appeal immediately cease and desist from releasing or otherwise exploiting the Album or any other unreleased recordings by Mr. Dunston, and that they confirm in writing to Company that they will not engage in any such exploitations.

MMMG simultaneously sent a copy of the Cease and Desist to Cordae's attorneys.

45. Upon information and belief, EMPIRE and Mass Appeal informed AI of the contents of the Cease and Desist.

46. On that same day, MMMG also sent Cordae's attorneys a separate letter, which reiterated that any release of *Heavy Is The Crown* would infringe Company's copyrights, and breach MMMG's contractual right to Cordae's exclusive recording services. The letter also provided formal notice that Cordae remained in breach of Sections 7 and 11 of the Recording Agreement. It demanded that Cordae cure those breaches.

47. After Company transmitted these letters, MMMG made clear that it was open to a reasonable business resolution of this matter that would respect MMMG's rights and properly compensate MMMG. However, MMMG's invitation for a business resolution was rebuffed.

48. Instead, Cordae's representatives asserted bad-faith challenges to the validity of the Stem Agreement **for the first time ever**. Notably, these challenges were utterly lacking in merit. By way of example, one of Cordae's attorneys contended that the Stem Agreement purportedly was invalid because Cordae did not sign a so-called "inducement letter" consenting to its terms. However, the Recording Agreement contains no requirement whatsoever for an inducement letter.

49. In any event, Cordae is barred by the doctrines of waiver and estoppel from asserting these (meritless) challenges to the validity of the Stem Agreement at this late date. The law does not permit Cordae to strategically sit silently during the Shopping Period, with the knowledge that (a) MMMG was relying upon his silence in response to the September 4, 2025 letter to conclude he had no objection to the Stem Agreement; and (b) Cordae would challenge the Stem Agreement long after the Shopping Period. If Cordae truly had objections to the Stem Agreement, however baseless they may be, it was incumbent upon him to assert them within the Shopping Period, so that MMMG could resolve those objections.

### H. Defendants Release the Track "A Good Day," Which Infringes MMMG's Copyright and Breaches the Recording Agreement

50. Regrettably, none of the Defendants paid heed to the Cease and Desist. On September 16, 2026, Defendants released an advance single from *Heavy Is The Crown* entitled "A Good Day" to digital service providers for streaming and downloading by consumers. Simultaneously, Defendants released a music video for "A Good Day" in which Cordae performs.

51. Under the Recording Agreement, MMMG is the exclusive owner of the copyright in the sound recording entitled "A Good Day," which has been registered with the United States Copyright Office as SR 1-078-770. As the copyright owner, MMMG has the exclusive rights, among other things, to reproduce "A Good Day" in copies, to adapt it, to distribute copies to the public, to perform "A Good Day" publicly by means of a digital audio transmission, and to license these exclusive rights including on television and over the Internet. As a result, Defendants' exploitations of "A Good Day" infringe MMMG's copyright.

52. Further, under Section 2 of the Recording Agreement, MMMG has the exclusive right to Cordae's recording services. Through the release of "A Good Day," Cordae has breached

Section 2. Additionally, the other Defendants have induced Cordae's breach with full knowledge of the exclusivity provision in Section 2, and therefore they are tortiously liable for interfering with MMMG's contractual relations.

## CLAIMS FOR RELIEF

### COUNT I – COPYRIGHT INFRINGEMENT

### (Against All Defendants)

53. Plaintiff repeats and re-alleges each and every allegation in Paragraphs 1 through 52 as if fully set forth herein.

54. Plaintiff is the copyright owner of "A Good Day."

55. Defendants have engaged, and continue to engage, in the unauthorized reproduction, adaptation, distribution, and public performance of "A Good Day." Each of the Defendants has violated MMMG's exclusive rights under the Copyright Act through their roles in the exploitation of "A Good Day," including: (i) creating the unauthorized infringing work; (ii) distributing the unauthorized infringing work; (iii) causing the public performance of unauthorized infringing works on streaming services; and (iv) directing the creation of infringing derivative works such as the accompanying music video. This activity constitutes copyright infringement by Defendants in violation of 17 U.S.C. §§ 106 and 501 *et seq.*

56. Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Plaintiff's rights.

57. As a direct and proximate result of Defendants' infringement of "A Good Day," Plaintiff is entitled to actual damages under the Copyright Act, including, but not limited to, Defendants' direct and indirect profits from the infringement, in an amount no less than $5 million. Alternatively, at Plaintiff's election, Plaintiffs is entitled to statutory damages in an

amount of up to $150,000 with respect to each work infringed, or such other amounts as may be proper under 17 U.S.C. § 504(c).

58. Plaintiff is further entitled to attorneys' fees and costs pursuant to 17 U.S.C. § 505.

59. If Defendants release additional tracks from *Heavy Is The Crown*, Plaintiff will add claims for copyright infringement in connection with them.

60. Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause, Plaintiff great and irreparable injury that cannot fully be compensated for or measured in money, such that Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting further infringements of their exclusive rights under copyright.

**COUNT II – BREACH OF THE RECORDING AGREEMENT**

**(Against Cordae)**

61. Plaintiff repeats and re-alleges each and every allegation in Paragraphs 1 through 52 as if fully set forth herein.

62. The Recording Agreement is a valid and enforceable contract.

63. MMMG has performed its obligations under the Recording Agreement or, alternatively, it is excused from doing so.

64. Cordae breached, and continues to breach, Sections 2, 7, and 11 of the Recording Agreement.

65. MMMG suffered millions of dollars of damages as the direct and proximate result of Cordae's breaches; these include both direct and consequential damages.

66. Cordae's conduct is causing, and unless enjoined by this Court, will continue to cause, Plaintiff great and irreparable injury that cannot fully be compensated for or measured in money, such that Plaintiff has no adequate remedy at law. Plaintiff is entitled to a permanent injunction prohibiting further breaches of their contractual rights.

**COUNT III – TORTIOUS INTERFERENCE WITH THE RECORDING AGREEMENT**

**(Against EMPIRE, AI, and Mass Appeal)**

67. Plaintiff repeats and re-alleges each and every allegation in Paragraphs 1 through 52 as if fully set forth herein.

68. The Recording Agreement is a valid and enforceable contract between MMMG, on one hand, and Defendants, on the other hand.

69. MMMG has performed its obligations under the Recording Agreement or, alternatively, it is excused from doing so.

70. At all relevant times, EMPIRE, AI, and Mass Appeal have known the existence and terms of the Recording Agreement.

71. Cordae breached the Recording Agreement, including Paragraph 2 therein.

72. EMPIRE, AI, and Mass Appeal intentionally procured and induced these contractual breaches by Cordae (the "Interference").

73. But for the Interference of EMPIRE, AI, and Mass Appeal, Cordae would not have committed these contractual breaches.

74. EMPIRE, AI, and Mass Appeal undertook the Interference with wanton, intentional, malicious, deliberate, and/or reckless disregard of the rights of MMMG.

75. As a result of Cordae's breaches, MMMG has incurred millions of dollars in damages.

## PRAYER FOR RELIEF

WHEREFORE, MMMG prays for judgment from this Court against Defendants as follows.

On Count One:

a. An adjudication that Defendants have willfully infringed "A Good Day" in violation of the Copyright Act;

b. Plaintiff's actual damages pursuant to 17 U.S.C. § 504(b), including Defendants' profits from infringement, in an amount to be proven at trial but in all events, an amount no less than $5 million, or in the alternative, for statutory damages for pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from Defendants' willful violations of Plaintiff's rights under the Copyright Act;

c. For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiff's copyrights in Cordae's sound recordings, including a permanent injunction requiring that Defendants and their officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiff's copyright rights in Cordae's sound recordings;

d. For an award of Plaintiff's costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

e. For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendants; and

f. For such other relief and further relief as the Court deems proper.

On Count Two:

a. An adjudication that Cordae breached the Recording Agreement;

b. Plaintiff's actual damages, in an amount to be proven at trial but in all events, an amount no less than $15 million;

c. For such equitable relief as is necessary to prevent or restrain further breaches of the Recording Agreement by Cordae;

d. For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendants; and

e. For such other relief and further relief as the Court deems proper.

On Count Three:

a. An adjudication that EMPIRE, AI, and Mass Appeal tortiously interfered with the Recording Agreement;

b. Plaintiff's actual damages, in an amount to be proven at trial but in all events, an amount no less than $5 million;

c. For such equitable relief as is necessary to prevent or restrain further interference with the Recording Agreement;

d. For punitive damages in an amount to be determined at trial;

e. For pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against Defendants; and

f. For such other relief and further relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims and issues that are so triable.

Dated: New York, New York
October 15, 2026

Respectfully submitted,

Jeffrey M. Movit
Mary K. Guyer
COHEN & GRESSER LLP
800 Third Avenue
New York, NY 10022
Tel: (212) 957-7006
jmovit@cohengresser.com
mguyer@cohengresser.com

*Attorneys for Plaintiff MMMG, Inc.*